UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Polar Tank Trailer, Inc.,
a Minnesota corporation,

Plaintiff,

vs.

Michael J. Weigelt,

Defendant.

ORDER
and
REPORT AND RECOMMENDATION

Civ. No. 00-379 (JRT/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 25th day of May, 2000.

I. Introduction

On April 19, 2000, the Court heard argument on the Defendant's Motion for a Change of Venue,[1] and on the Plaintiff's Motion for a Temporary Injunction. At that time, the Plaintiff Polar Tank Trailer, Inc. ("Polar"), appeared by Thomas P. Melloy, Esq., and the Defendant Michael J. Weigelt ("Weigelt") appeared by William R. Hobson, Esq.

---

[1]In addition, the Defendant filed a Motion to Continue Oral Argument on the Plaintiff's Application for a Temporary Restraining Order/Preliminary Injunction. According to the Defendant, a Hearing on the Plaintiff's Motion for injunctive relief should not occur until we consider and decide his Motion for a Change of Venue. However, at the time of the Hearing, notwithstanding the Defendant's concerns, we chose to deny his request for a continuance, and entertain oral argument on both Motions, in order to facilitate a "just, speedy, and inexpensive determination" of the present action. Rule 1, Federal Rules of Civil Procedure.

FILED MAY 25 2000
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD______
DEPUTY CLERK______

For reasons which follow, Weigelt's Motion for a Change of Venue is denied, and we recommend that Polar's Motion for Injunctive Relief be denied.

II. Factual and Procedural Background

Polar is a Minnesota corporation that manufactures tank trailers for over-the-road use at its facilities in Minnesota, and Missouri. Polar sells these trailers throughout the United States, and in other countries in North and South America. See, Plaintiff's Memorandum in Support of Motion for Temporary Injunction, at 1. As noted by Polar, the business of selling tank trailers, within the United States, encompasses a fairly small and well-defined market, with a significant portion of sales coming from repeat business by current customers. Id., at 2.

On August 4, 1997, Weigelt was hired by Polar as the International Regional Sales Manager. Weigelt's employment officially began when he signed a Regional Management Employment and Compensation Agreement ("Employment Agreement") on August 4, 1997. See, Weigelt Aff., at ¶ 8; Koll Aff., Ex. G. Polar asserts that Weigelt was hired as a "sales trainee" for this position, and that he had no prior experience in the sale of trucks, tractors, or truck parts. Id. In contrast, Weigelt disputes these contentions, and asserts that he received training and experience in the transportation industry, while working for Anderson Trucking, prior to his

employment with Polar. See, Sworn Declaration of Michael J. Weigelt, at ¶ 6.

Following his initial hire, Weigelt was presented with a Non-Competition Agreement ("Non-Compete Agreement"), on August 19, 1997, which he signed. See, Affidavit of John R. Koll, Ex. G. Paragraphs 2.1-2.3 of the Non-Compete Agreement state, in pertinent part:

> Employee agrees that [he] * * * shall not, without employer's prior written consent (which may be withheld with or without reason), engage or be interested, directly or indirectly, whether alone or together, with or on behalf of or through any other person, firm, partnership, association, trust, venture, corporation, or business organization, entity, or enterprise, whether as sole proprietor, partner, investor, stockholder, or any type of principal whatever, or as agent, officer, director, employee, technical advisor (except as consultant to employer), lender, trustee, beneficiary, or otherwise, in any phase of the "restricted business," as hereinafter defined, cannot compete anywhere on the continent of North America * * * .
>
> * * *
>
> The term "restricted business" means any business any part of which consists of the manufacturing of commercial bulk trailers or tanker trailers or any other related product, or any combination thereof, and likewise includes any business of a kind in whole or in part similar to the business engaged in by the employer.
>
> * * *

> The term "engage or be interested, directly or indirectly" as used herein shall include without limitation giving advice or technical or financial assistance by loan, guarantees, stock transactions, or in any other manner to any person, firm, partnership, association, trust, venture, corporation or business organization, entity, or enterprise doing or about to do such "restricted business" in the area covered by this agreement; but shall not by itself include the ownership of less than five (5%) percent of the outstanding stock of a corporation the shares of which are traded on national securities exchange.

Koll Aff., Ex. G.

Weigelt's Non-Compete Agreement applied to a three year period, which would immediately follow the termination of his employment, and it also included a confidentiality provision. See, Plaintiff's Memorandum in Support of Motion for a Temporary Injunction, at 2.

According to Weigelt, the Non-Compete Agreement was not referenced in the initial Employment Agreement, nor was any obligation to sign the Non-Compete Agreement expressly required at the time that his initial employment began on August 4, 1997. See, Weigelt Dec., at ¶ 8. In addition, Weigelt insists that he did not receive any compensation, or other consideration, for signing the Non-Compete Agreement, which was signed fifteen days after his initial hiring date. Id. at ¶ 9.

On November 19, 1999, Weigelt voluntarily terminated his employment with Polar. Id., at 3. The following month, Weigelt moved to Arizona, and began working for the Beall Corporation

("Beall"). See, Defendant's Memorandum in Response to Motion for Temporary Injunction, at 2-3. According to Weigelt, Beall is a corporation that has a significantly different product line than Polar. See, Weigelt Dec., at ¶ 21. In addition, Weigelt contends that only an small percentage of Beall's product inventory involves tank trailers. Id., at ¶ 22. Notwithstanding these assertions, Polar maintains that Beall is a "direct competitor" for its business. See, Plaintiff's Memorandum in Support of Motion for a Temporary Injunction, at 3.

Consequently, Polar argues that a temporary injunction is needed so as to immediately enforce the Non-Compete Agreement, and thereby prohibit Weigelt from enjoying continued employment in his current position. Apparently, Polar provided Weigelt with "technical and engineering information regarding the design and manufacture of its trailers, as well as training and information regarding its pricing structure, marketing plans, sales programs and dealership structure." Plaintiff's Memorandum in Support of Motion for a Temporary Injunction, at 3. Further, as asserted by Polar, Weigelt was directly involved in developing new markets in Mexico, and expanding markets in Canada, with a substantial portion of his training being devoted to developing sales opportunities in these same areas. Id. In addition, Polar contends that it sent Weigelt to trade shows in Canada, Mexico, and South America, two or three

times per year, and that these activities allowed Weigelt to "identify import brokers, work directly with dealers, and become familiar with the special requirements of potential purchasers in those markets." Id.

In turn, Weigelt argues that: (1) during his period of employment with Beall, he has not been involved in the sale of any tank trailers, nor has he provided information respecting tank trailers to any sales contacts or personnel of Beall; (2) he has had no contact on behalf of Beall with any international sales contacts with whom he had dealings while at Polar; and (3) his sales territory at Beall consists of the States of Arizona, Nevada, and New Mexico, and does not encompass Mexico, Canada, or South America. See, Weigelt Dec., at ¶¶ 23, 31, 32.

For his part, Weigelt has filed a Motion to Change the Venue of this action from the District of Minnesota, to the District of Arizona. According to Weigelt, the District of Arizona is the appropriate venue for this action, because it involves the application of the terms of the Non-Compete Agreement to activities taking place in Arizona, where he currently works and resides. In response, Polar contends that no change of venue is warranted, because the Non-Compete Agreement was signed in Minnesota, while Weigelt was a Minnesota resident. Also, Polar argues that any harm, that may be suffered through Weigelt's alleged violation of

the Non-Compete Agreement, will occur in Minnesota. Given this background, we turn to the parties' respective Motions.

III. Discussion

A. Polar's Motion for a Temporary Injunction.

1. Standard of Review. An Injunction is issued in order "to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." College Craft Companies, Ltd. v. Perry, Civ. No. 3-95-583, 1995 WL 783612, at *7 (D. Minn. Aug. 9, 1995), quoting Devose v. Herrington, 42 F.3d 471, 472 (8th Cir. 1994), citing, in turn, Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 & n. 5 (8th Cir. 1991)(en banc). In deciding a Motion for injunctive relief, a Court must weigh: (1) the threat of irreparable harm to the moving party; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant if the injunction is denied and the harm to other parties if the injunction is granted; and (4) the public interest. See, Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999); Dataphase Sys., Inc. v. CL Sys., Inc., supra at 113; Bloom v. O'Brien, 841 F. Supp. 244, 279 (D. Minn. 1993)("[T]he plaintiff bears the burden of proof concerning the four factors"). "These factors are not a rigid formula." Bandag, Inc. v. Jack's Tire & Oil, Inc., supra at 926. However, "'[t]he basis of injunctive relief in the federal courts

has always been irreparable harm and inadequacy of legal remedies.'" Id., quoting Beacon Theaters, Inc. v. Westover, 359 U.S. 500, 506-07 (1959). Thus, to warrant an injunction, the moving party must demonstrate a sufficient threat of irreparable harm. See, Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297, 299 (8th Cir. 1996).

When seeking a preliminary injunction, the burden on the movant "is a heavy one where, as here, granting the preliminary injunction will give [the movant] substantially the relief it would obtain after a trial on the merits." Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 486 (8th Cir. 1993), quoting Dakota Indus., Inc. v. Ever Best Ltd., 944 F.2d 438, 440 (8th Cir. 1993); Calvin Klein Cosmetics Corp. v. Lenox Laboratories, 815 F.2d 500, 503 (8th Cir. 1987); College Craft Companies, Ltd. v. Perry, supra at *7. Therefore, we turn our analysis to each of the requisite factors in order to determine if this is one of those instances in which the "extraordinary remedy" of an injunction is warranted. Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc., supra at 503; Jenson v. Eveleth Taconite Co., 139 F.R.D. 657, 667 (D. Minn. 1991).

2. Legal Analysis.

a. Threat of Irreparable Harm. "The threshold inquiry is whether the movant has shown the threat of irreparable

injury," and a determination that no irreparable harm has been demonstrated will end the matter. College Craft Companies, Ltd. v. Perry, supra at *7, quoting Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 371 (8th Cir. 1991), citing, in turn, Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987). "If the movant is without an adequate remedy at law, then it will have adequately demonstrated the threat of irreparable harm." College Craft Companies, Ltd. v. Perry, supra at *7, citing Baker Elec. Co-op., Inc. v. Chaske, 28 F.3d 1466, 1473 (8th Cir. 1994); Frank B. Hall & Co. v. Alexander & Alexander, Inc., 974 F.2d 1020, 1025 (8th Cir. 1992). "However, the mere fact that an action for damages is available to the movant does not, necessarily, 'preclude issuance of a preliminary injunction, because damages relief may not fully compensate the movant for being denied its rights.'" College Craft Companies, Ltd. v. Perry, supra at *7, quoting Curtis 1000, Inc. v. Youngblade, 878 F. Supp. 1224, 1248 (N.D. Iowa 1995), citing, in turn, Glenwood Bridge, Inc. v. City of Minneapolis, supra at 371-72. As the Court observed in Curtis 1000, "irreparable harm can be inferred in certain circumstances from wrongful conduct of the defendant, such as upon 'a trial court's actual finding of a breach [of a restrictive covenant] by the defendant.'" Curtis 1000, Inc. v. Youngblade, supra at 1248, quoting Overholt Crop Ins. Serv. Co. v. Travis, 941 F.2d 1361, 1371 (8th Cir. 1991).

Here, on the Record submitted, we conclude that Polar has failed to demonstrate a threat of irreparable harm. We recognize that Polar has urged that irreparable harm will befall it, if an injunction does not issue, but it has failed to support that conclusory assertion with any showing that Weigelt has misappropriated the knowledge, training, and experience, that he acquired with Polar, for his own benefit, or for the benefit of Beall. We understand that the information involved, which relates to technical and engineering materials, customer lists, marketing strategies, pricing structures, and product information, is commercially sensitive, but we are offered no evidence that Weigelt is, in fact, employing that information in any respect. See, Plaintiff's Memorandum in Support of Motion for a Temporary Injunction, at 5.

We understand, as urged by Polar, that Weigelt will be in a position to employ the knowledge, he secured from Polar in his prior employment, to compete for business in the markets of southwestern United States, Mexico, Central America, and South America, but Weigelt disavows any such interest or intent, and Polar has not affirmatively proffered evidence to the contrary. Moreover, Weigelt avers that his employment with Beall does not involve the sale of any tank trailers, and does not incorporate the geographic area that was encompassed by his duties at Polar, since he is only involved in sales that take place in Arizona, Nevada, and New

Mexico. See, Weigelt Dec., at ¶ 25. Further, Weigelt contends that he has not provided any information, to Beall, which pertains to the sale of tank trailers, nor has he had discussions with Polar clients with whom he previously had commercial contact. More importantly, however, Polar has failed to cite any specific instance of lost sales, or misappropriated information, that would cause it to lose business, or be harmed in some way.

While we appreciate Polar's concerns, and recognize the difficulty that Polar has, at this preliminary stage, to marshal evidence which supports those concerns, we are, nonetheless, obligated to scrutinize Polar's proofs to determine in its concerns are real or imagined. We certainly recognize that Weigelt could potentially impair Polar's customer relations, and misappropriate Polar's proprietary secrets, but Polar offers nothing more than its suspicion, predicated only upon that potential, that Weigelt has engaged in any such behavior, or that he is disposed to do so. Compare, PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995) (finding that former employee's untrustworthiness, alone, was sufficient to conclude that he would inevitably disclose trade secrets); with, APAC Teleservices, Inc. v. McRae 985 F. Supp. 852, 861-863 (N.D. Iowa 1997)(former employer's arguments of untrustworthiness failed to show that former employee was likely to disclose former employer's proprietary information). In our considered

view, to be cognizable, the "threat" of irreparable harm must be real and appreciable, and not merely a theoretical or conceivable possibility. See, College Craft Companies, Ltd. v. Perry, supra at *8, citing Allen v. State of Minnesota, 867 F. Supp. 853, 858 (D. Minn. 1995); Bloom v. O'Brien, supra at 279.

We can certainly understand Polar's stated concern that it will endure a loss of sales within the markets of Canada, Mexico, and South America, and in southwestern United States, but here, just as in College Craft Companies, Ltd. v. Perry, supra, that loss of sales is compensable, and Polar will be at liberty to calculate its anticipated sales and, conversely, any consequential losses that are properly attributable to Weigelt's claimed wrongdoing. Polar does not suggest any inability to calculate its losses, nor has it suggested that its anticipated losses would be so speculative as to be unreliable. See, e.g., College Craft Companies, Ltd. v. Perry, supra at *8; Millard v. Electronic Cable Specialists, 790 F. Supp. 857, 860 (D. Minn. 1992); Medtronic, Inc. v. Gibbons, 527 F. Supp. 1085, 1090-92 (D. Minn. 1981), aff'd 684 F.2d 565 (8th Cir. 1982). Accordingly, Polar has failed to persuasively demonstrate that Weigelt is misappropriating information, garnered from his prior employment with Polar, to harm Polar's business interests in any respect.

b. Balancing of Harms. "In weighing the respective harms that would be caused by the issuance of an injunction -- or by the failure to enjoin -- we look to the potential economic harm that could be inflicted upon each of the parties and those third persons who may have derivative interests." College Craft Companies, Ltd. v. Perry, supra at *8, citing Baker Elec. Co op., Inc. v. Chaske, 28 F.3d 1466, 1473 (8th Cir. 1994).

As to this factor, Weigelt argues that the harm he would suffer, should an injunction be issued, would exceed any harm to Polar, if an injunction were denied, because he earns the relatively insignificant sum of $45,000 a year, while Polar is a multinational corporation; he has had little or no business experience other than that in his area of expertise; and, he has a wife and two children who are dependent upon his employment, with Beall, for their sole source of income.

In support of its position, Polar underscores the fact that, under Minnesota law, irreparable harm may be inferred from the breach of a restrictive covenant in an employment contract. See, Thermorama, Inc. v. Buckwold, 125 N.W.2d 844, 845 (1964); Overholt Crop Ins. Serv. Co. v. Bredson, supra at 701. As well, Polar renews its argument that, because of his employment with Beall, Weigelt is in a position to misappropriate the knowledge, training, and experience, that he acquired in its employ, and that such an

appropriation of Polar's proprietary acumen would allow Beall an advantage in competing with Polar in the marketplace. Lastly, Polar emphasizes that any harm to Weigelt would be mollified by the fact that the Non-Compete Agreement is only enforceable for a period of three years, and only in continental North America.

We conclude, based on the Record presented, that the balance of harms reveals that Weigelt will suffer more significantly from a grant of injunctive relief, than would Polar, if the relief were denied. An enforcement of the expansive prohibitions of Polar's Non-Compete Agreement would effectively preclude Weigelt from obtaining employment, in broad geographic areas -- including all of the United States -- in his field of expertise, for an extended period of time. Indeed, as we stated at the Hearing, the proscriptions of the Non-Compete Agreement are so broadly enveloping, that we are hard-pressed to ascertain, in any definitive way, their full preclusive effect. One reading of the prohibitions would appear, at least arguably, to exclude Weigelt from many segments of the motor vehicle industry, however remote Weigelt's involvement may seem from the essential aspects of Polar's commercial market. While Polar may not now press for such a draconian enforcement of those employment proscriptions, we cannot exclude the potential that an enforcment will follow Weigelt where ever he should seek

employment, given the apparent limitlessness of the language employed.

Nor, for these purposes, can we overlook the reality that an award of injunctive relief would effectively terminate Weigelt from his current position, leaving him with no immediate means to support his wife and family. No harm, at this point, has been documented by Polar, nor has Polar reliably substantiated its fear of substantial harm by anything more than suspicion and surmise. As a result, on the Record before us, we find and conclude that the balance of harms weighs in favor of a denial of Polar's request for injunctive relief.

c. The Likelihood of Success on the Merits. "In appraising the substantive merits of the parties' competing claims, it is not our function to decide 'with any degree of certainty who will succeed or not succeed.'" College Craft Companies, Ltd. v. Perry, supra at *9, quoting O'Connor v. Peru State College, 728 F.2d 1001, 1002 (8th Cir. 1984). As we stated in College Craft Companies, Ltd., supra at *9:

> In Dataphase, the Court expressly rejected a construction that would equate the "probability of success" element with a requirement that the moving party must "prove a mathematical probability of success at trial." Dataphase Systems, Inc. v. C L Systems, Inc., supra at 113. Rather, "[i]n order to weigh in the movant's favor, the movant's success on the merits must be 'at least * * * suffi-

> ciently likely to support the kind of relief it requests.'" Curtis 1000, Inc. v. Youngblade, supra at 1247, quoting Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co., supra at 488.

In making this evaluation, we are persuaded that Polar has failed to sufficiently demonstrate a likelihood of success on the merits, particularly with respect to the Non-Compete Agreement that it seeks to enforce. Under Minnesota law:

> Covenants not to compete are agreements in partial restraint of trade, limiting as they do the right of a party to work and earn a livelihood. Bennett v. Storz Broadcasting Co., 270 Minn. 525, 533, 134 N.W.2d 892, 989 (1965). Courts, including this one, look upon such contracts with disfavor and scrutinize them with care. National Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740 (Minn. 1982).

Id., citing Freeman v. Duluth Clinic, Ltd., 334 N.W.2d 626, 630 (Minn. 1983).

Here, the Record demonstrates that the Non-Compete Agreement was secured after Weigelt had commenced his employment with Polar. As was the case in College Craft, there is no showing that the Non-Compete Agreement was secured with any direct tie to a specific employment benefit -- other than, arguably, a continuation of the employment relationship.

As the Minnesota Supreme Court held, in Freeman v. Duluth Clinic, Ltd., supra at 630:

> If the covenant [not to compete] is not made ancillary to the initial employment contract, it can be sustained only if it is supported by

> independent consideration. * * * The adequacy of consideration for restrictive covenants signed during an ongoing employment relationship will depend on the facts of each case. The mere continuation of employment can be used to uphold coercive agreements, but the covenant must be bargained for and provide the employee with real advantages. Davies v. Davies Agency, Inc. v. Davies, 298 N.W.2d 127, 130-31 (Minn. 1980).

See also, National Recruiters, Inc. v. Cashman, supra at 740; Modern Controls, Inc. v. Andrea Dakis, 578 F.2d 1264, 1267 (8th Cir. 1978)(specifically stating that where a covenant not to compete was not ancillary to the initial oral employment contract, the covenant can be sustained only if it is supported by independent consideration).

Whether the Non-Compete Agreement, which was signed by Weigelt on August 19, 1997, was ancillary to the initial Employment Agreement, which was signed by Weigelt on August 4, 1997, is hotly contested. See, Koll Aff., Exs. H and G. As noted by Polar, the Non-Compete Agreement specifically states that, prior to the acceptance of his employment, Weigelt was advised that, as a condition of his employment, he would be required to sign a Non-Compete Agreement. See, Koll Aff., Ex. G. However, in spite of this contractual provision, Weigelt avers that, at the time of his hiring, he was not made aware that his employment was contingent upon his acceptance of a Non-Compete Agreement, and that he signed the Non-Compete Agreement without consulting an attorney. See, Weigelt Dec., at ¶¶ 8-9.

Weigelt's failure to read the Non-Compete Agreement, or comprehend its relevant terms, prior to his acceptance of its

provisions, has no bearing on its validity. "In the absence of fraud or misrepresentation, a person who signs a contract may not avoid it on the ground that he did not read it or thought its terms to be different." See, e.g. Gartner v. Eikill, 319 N.W.2d 397, 398 (Minn. 1982); N&D Fashions, Inc. v. DHJ Industries, Inc., 548 F.2d 722, 727 (8th Cir. 1976); Greer v. Kooiker, 253 N.W.2d 133, 140 (Minn. 1977). Nevertheless, the fact that Polar informed Weigelt, at the onset of his employment, that he would be required to sign a Non-Compete Agreement, as a condition of his employment, does not alter our firm conviction that, absent a showing not presently made, th Non-Compete Agreement is in substantial jeopardy of being invalidated for want of independent consideration.

As explained by the Court in National Recruiters, Inc. v. Cashman, supra at 740-41, citing Davies v. Davies Agency, Inc. v. Davies, supra 130-31:

> [In Davies] * * * an employee of the Davies Agency, Robert Buckingham ("Buckingham"), knew before beginning work that he would be required to sign a non-competition agreement. He was not aware of the terms of the agreement and was not shown and asked to sign the agreement until 11 days after beginning work. We held that continued employment alone was not sufficient to support the covenant. * * * Buckingham had not "derived substantial economic and professional benefits from the agency after signing the contract." Id. at 131. We affirmed the trial court's decision that the non-competition agreement was without consideration and unenforceable.

Here, as in Davies, Weigelt was not presented with the specific terms of the Non-Compete Agreement, nor was he asked to sign the agreement, until 15 days after his work began. Polar presents no evidence that Weigelt was informed, as a condition for specific employment benefits, that he either sign the Non-Compete Agreement, or suffer an adverse consequence. While Polar intimates that Weigelt's training was conditioned upon the signing of a non-compete provision, Weigelt disputes both that assertion, and the adequacy of the training. In any event, the Record is clear that, by the time that the Non-Compete Agreement was executed, Weigelt's initial training had been completed. Quite simply, the Record before us is bereft of any showing that the Non-Compete Agreement was ancillary to Weigelt's Employment Agreement, or was supported by consideration, as the Minnesota Supreme Court construed those terms in National Recruiters.

As we stated in College Craft Companies, Ltd. v. Perry, supra at *10, "the development of the jaundiced judicial view toward restrictive covenants was precisely to counter the unfairness of an employer utilizing its 'unequal bargaining power' to exact promises from its employee after the employment relationship had commenced." Here, as in College Craft Companies, Ltd., there is no evidence that Weigelt received substantial economic or professional benefit, after signing the Non-Compete Agreement, that were not equally

available to him at the time of his initial hire. Indeed, as averred by Weigelt, apparently a number of Polar's employees, whose hiring date predated his own, were paid a sum of money for agreeing to sign the Non-Compete Agreement, while he was paid nothing. Weigelt Dec., at ¶ 10.

Secondly, it appears that Polar's Non-Compete Agreement will be subject to critical -- perhaps fatal -- legal attack, because it is far broader in scope than reasonably necessary to protect any legitimate need of Polar. Under Minnesota law, employee non-competition agreements must be reasonable to be enforceable. See, Satellite Indus., Inc. v. Keeling, 396 N.W.2d 635, 640 (Minn.App. 1986), rev. denied (Minn. Jan. 21, 1987); Minnesota Mining & Manufacturing Co. v. Kirkevold, 87 F.R.D. 324, 328 (D. Minn. 1980), citing Cherne Industrial, Inc. v. Grounds & Assocs., 278 N.W.2d 81, 88 n.2 (Minn. 1979); Walker Employment Service, Inc. v. Parkhurst, 219 N.W.2d 437, 441 (Minn. 1974); Eutectic Welding Alloys Corp. v. West, 160 N.W.2d 566, 570 (Minn. 1968); and Bennett v. Storz Broadcasting Co., 134 N.W.2d 892, 899 (Minn. 1965); see also Medtronic, Inc. v. Gibbons, 684 F.2d 565, 568 (8th Cir. 1982)(Minnesota Law); Modern Controls, Inc. v. Andreadakis, supra at 1269, n. 12 (Minnesota law). Further, contracts that unreasonably restrain trade are contrary to public policy, and are therefore void. See, Montana-Dakota Utilities Co. v. Williams

Electric Coop., 263 F.2d 431, 433 (8th Cir. 1959)(noting that this is such an elementary and universally recognized rule of law that citation of authorities should not be necessary).

As the Court stated in Bennett v. Storz Broadcasting Co., supra at 899:

> The test applied is whether or not the restraint is necessary for the protection of the business or good will of the employer, and if so, whether the situation has imposed upon the employee any greater restraint than is reasonably necessary to protect the employer's business, regard being had to the nature and character of employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.

Here, the terms Polar's Non-Compete Agreement are patently, and unambiguously, expansive, if not overreaching. First, because of the Non-Compete Agreement's far-reaching definition of "restricted business", i.e., "**any** business **any** part of which consists of the manufacturing of commercial bulk trailers or tanker trailers, **or any other related product**", Koll Aff., Ex. G., at 2.2 [emphasis added], if enforced, Weigelt would be prohibited from engaging in a wide variety of employment, that is clearly not encompassed within Polar's legitimate business market. For example, because the Non-Compete Agreement prohibits Weigelt from "engag[ing] in or be[ing] interested, directly or indirectly, * * * in **any phase** of the 'restricted business,'" Weigelt's employment as a welder for a

company that manufactures the wheels of tanker trailers would be suspect. Id. In addition, the Non-Compete Agreement covers all of North America -- even those portions in which Polar has not, and does not commercially engage -- and extends for a period of three years.

Unreasonably broad non-competition agreements can be limited to include only the area where the employee performed duties, the employer's business area, the employer's customers, or a reasonable geographical area. See, Davies & Davies Agency, Inc. v. Davies, supra at 127; Roth v. Gamble-Skogmo, Inc., 532 F. Supp. 1029, 1031 (D. Minn. 1982). Here, Weigelt's employment with Polar did not encompass the regions in which his current employment is focused; namely, Nevada, Arizona, and New Mexico. At Polar, Weigelt was involved primarily with international sales. As such, the scope of Polar's Non-Compete Agreement is of dubious legality.

In sum, we wish to make plain that our present analysis is premised upon the parties' current showings, and we do not here rule that the Non-Compete Agreement is legally unenforceable, for that is not our present function. We merely find, at this preliminary juncture, that, in all likelihood, Weigelt will ultimately be successful in his challenge to the legal validity of the Non-Compete Agreement.

d. The Public Interest. "[T]he public interest is served by upholding valid restrictive covenants," for "[r]estraining unfair competition does not violate public policy." College Craft Companies, Ltd. v. Perry, supra at *11, quoting, Millard v. Electronic Cable Specialists, supra at 863, citing Olin Water Services v. Midland Research Laboratories, Inc., 596 F. Supp. 412, 415 (E.D. Ark. 1984), appeal dismissed, 774 F.2d 303 (8th Cir. 1985); see also, N.I.S. Corp. v. Swindle, 724 F.2d 707, 710 (8th Cir. 1984). "On the other hand, no public interest is furthered by forcing parties to adhere to a restrictive covenant which is invalid, illegal or unreasonable." College Craft Companies, Ltd. v. Perry, supra at *11. We conclude that, under the present circumstances, the public interest does not support the granting of injunctive relief under the present circumstances.

"In sum, our approach toward the issuance of a Preliminary Injunction is, necessarily, flexible so as to encompass and to accommodate the particular circumstances of each case." College Craft Companies, Ltd. v. Perry, supra at *12, citing Millard v. Electronic Cable Specialists, supra at 861, citing, in turn, Dataphase Systems, Inc. v. C L Systems, Inc., supra at 113. "At its core, however, 'the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" Col-

lege Craft Companies, Ltd. v. Perry, supra at *12, quoting Dataphase Systems, Inc. v. C L Systems, Inc., supra at 113. Here, after a considered review of the evidence contained in the Record, we are satisfied that injunctive relief is not warranted, and should not issue. See, College Craft Companies, Ltd. v. Perry, supra at *12; Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985); Church of God in Christ v. Graham, 54 F.3d 522, 525 (8th Cir. 1995); Taylor v. Turner, 884 F.2d 1088, 1090 (8th Cir. 1989). Therefore, we recommend that Polar's Motion for a Temporary Injunction be denied.

B. Weigelt's Motion for a Change of Venue.

1. Standard of Review. Congress designed Title 28 U.S.C. §1404(a) "as a 'federal housekeeping measure,' allowing for easy change of venue within a unified federal system." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981), quoting Van Dusen v. Barrack, 376 U.S. 612, 635 (1964). Section 1404(a) provides that, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Title 28 U.S.C. §1404(a). As we noted in Durabla Manufacturing Co. v. Continental Casualty Co., No. 98-1596, 1998 WL 957250 *2 (D. Minn. Oct. 26, 1998), our Court of Appeals has enun-

ciated, as follows, the well-settled analytical framework that is employed in considering a Section 1404(a) Motion:

> The statutory language reveals three general categories that courts must consider when deciding a motion to transfer: (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice.

Terra Int'l, Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 691 (8th Cir. 1997), citing Title 28 U.S.C. §1404(a).

"While these factors establish a structure for the Court's consideration of a Motion to Transfer, in reality, they incorporate a method of case-by-case analysis, which 'calls on the district court to weigh in the balance a number of case-specific factors,' Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988), of which 'there is no exhaustive list * * *.'" Durabla Manufacturing Co. v. Continental Casualty Co., supra at *2, quoting Terra Int'l Inc. v. Mississippi Chem. Corp., supra at 691; see also, Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3rd Cir. 1995).

"As expressed in the context of the doctrine of forum non conveniens, which was a precursor to Section 1404(a), the Supreme Court enunciated a general, nonexclusive list of private and public interests, which might assist the Courts in evaluating an effort to transfer venue." Durabla Manufacturing Co. v. Continental Casualty Co., supra at *2, citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501

(1947). The Gilbert Court enunciated the private interests that should influence the selection of venue, as follows:

> [R]elative ease of access to the sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of the premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

Gulf Oil Corp. v. Gilbert, supra at 508.

The Court then characterized some of the significant public interests:

> Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in view and reach rather than remote parts of the country where they can learn of it by report only.

Id.

"Although we possess somewhat broader discretion in deciding a Motion for a transfer of venue under Section 1404(a), than had been the case under the doctrine of forum non conveniens, the moving party still 'bears a heavy burden of showing that the 'balance of factors strongly favors' a transfer." Durabla Manufacturing Co. v. Continental Casualty Co., supra at *3, citing Radisson Hotels Int'l, Inc. v. Westin Hotel Co., 931 F. Supp. 638, 641 (D. Minn. 1996), quoting, in turn United States Mortgage Corp. v. Plaza Mort-

gage Corp., 853 F. Supp. 311, 314 (D. Minn. 1994). "Generally, a plaintiff's choice of a forum is a central consideration in determining whether to transfer an action and, therefore, that choice should not be lightly disturbed." Durabla Manufacturing Co. v. Continental Casualty Co., supra at *3, citing Brockman v. Sun Valley Resorts, Inc., 923 F. Supp. 1176, 1179 (D. Minn. 1996)(Court is "to defer to the Plaintiffs' choice of [forum] unless factors outlined in Gilbert strongly weigh in favor of transfer"); United Mortgage Corp. v. Plaza Mortgage Corp., supra at 315 ("There is a presumption in favor of the plaintiff's choice of forum."); but cf., Medtronic, Inc. v. American Optical Corp., 337 F. Supp. 490, 497 (D. Minn. 1971)("[A] plaintiff's choice of forum is no longer entitled to the great weight given it under the doctrine of forum non conveniens"). "At bottom, a transfer should not be granted merely to shift the inconvenience from one of the litigants to another." Durabla Manufacturing Co. v. Continental Casualty Co., supra at *3, citing Van Dusen v. Barrack, supra at 646; Radisson Hotels Int'l, Inc. v. Westin Hotel Co., supra at 641.

B. Legal Analysis. At the outset, we note that our analysis entails a presumption, clearly rebuttable, that this action should remain in the District in which it was first venued. See, Durabla Manufacturing Co. v. Continental Casualty Co., supra

at *3. With this in mind, we turn to an analysis of the four factors which bear upon our decision on whether to transfer venue.

1. The Convenience of the Parties and Witnesses. "The convenience of the parties is the least important of the three groupings of considerations, which are involved in the analysis under Section 1404(a)." Durabla Manufacturing Co. v. Continental Casualty Co., supra at *3, citing Wright, Miller & Cooper, Federal Practice and Procedure §3849, 1998 Supplement, p. 77.

Here, Weigelt argues that a convenience analysis weighs in favor of transferring venue to Arizona, which is the location in which he currently resides, and is employed at Beall, because any witnesses to an alleged violation of the Non-Compete agreement would be located in Arizona. However, as we observed in Durabla, in attempting to show that the convenience of the witnesses would be better served in a proposed transferee forum, generalized allegations, that are bereft of any description of what these witnesses' testimony would be, are insufficient. See, Durabla Manufacturing Co. v. Continental Casualty Co., supra at *4, citing Systemiation, Inc. v. Engel Indus., Inc., 992 F. Supp. 58, 63 (D. Mass. 1997); Bacik v. Peek, 888 F. Supp. 1405, 1415 (N.D. Ohio 1993); Falconwood Fin. Corp. v. Griffin, 838 F. Supp. 836, 840-41 (S.D.N.Y. 1993); Oxford Transp. Servs., Inc. v. MAB Refrigerated Transp., Inc., 792 F. Supp. 710, 714 (D. Kan. 1992). Here, Weigelt

has failed to identify, with particularity, the Arizona witnesses whose testimony will prove to be necessary at Trial, and similarly, has failed to disclose the likely content of their testimony.

In contrast, as urged by Polar, Minnesota is an appropriate venue because: (1) Polar's principal place of business is located in Minnesota; (2) the Non-Compete Agreement was signed in Minnesota; and (3) all of Weigelt's employment with Polar took place in Minnesota. Further, Polar asserts that its principal manufacturing plant, and its administrative offices, are in Minnesota, and therefore, any harm it may suffer, as a result of Weigelt's current employment with Beall, will occur in Minnesota. Finally, as argued by Polar, except for Weigelt, all witnesses, documents, and evidence, which bear on the validity of the Non-Compete Agreement itself, are located in Minnesota. However, as was the case with Weigelt, Polar has failed to particularize the documents, witnesses, and evidence of harm, that are likely to be located in Minnesota. Therefore, we are convinced that neither party has demonstrated that "a transfer of this action would equitably shift the convenience from one party to the other." <u>Durabla Manufacturing Co. v. Continental Casualty Co.</u>, supra at *4, citing <u>Radisson Hotels Int'l, Inc. v. Westin Hotel Co.</u>, supra at 641.

2. <u>The Interests of Justice</u>. The "interests of justice," factor "has been deemed the most important §1404(a) factor,"

Radisson Hotels Int'l, Inc. v. Westin Hotel Co., supra at 641, and represents a myriad of fact-specific considerations which implicate judicial economy and the public welfare. See, Durabla Manufacturing Co. v. Continental Casualty Co., supra at *4. The potential factors to be considered include: judicial economy, see, In re Warrick, 70 F.3d 736, 740 (2nd Cir. 1996); the Plaintiff's choice of forum, see, Terra Int'l Inc. v. Mississippi Chem. Corp., supra at 695; docket congestion, see, Fannin v. Jones, 229 F.2d 368, 369-70 (6th Cir. 1956), cert. denied, 351 U.S. 938 (1956); the Courts' relative familiarity with the applicable law, see, Van Dusen v. Barrack, supra at 645; and, the desire to avoid multiplicity of related litigation, see, Black & Decker Corp. v. Amirra, Inc., 909 F. Supp. 633, 639 (W.D. Ark. 1995).

Here, in our consideration of the interests of justice, the most important factors are Polar's choice of forum, and the source of the law that will govern the resolution of this dispute. Notably, under the terms of the Non-Compete Agreement, Minnesota law will govern the outcome of this action. For example, in support of his position that Polar's Non-Compete Agreement is invalid, Weigelt cites Minnesota law for the proposition that, under these particular circumstances, independent consideration has not been demonstrated. In addition, Weigelt argues that we should apply Minnesota's "blue line" doctrine, so as to judicially limit the time,

scope, and territory, that is encompassed by Polar's Non-Compete Agreement. Further, given our involvement in the resolution of Polar's Motion for a Temporary Injunction, as well as our familiarity with Minnesota law, as it applies to noncompete provisions, among other issues, the selection of this forum, to address matters of Minnesota law -- all other things being equal -- is to be preferred. Therefore, the interests of judicial economy weigh against Weigelt's proposal for a transfer of venue.

Furthermore, Minnesota represents Polar's venue choice, and the law makes clear that "[t]here is a presumption in favor of the plaintiff's choice of forum." United Mortgage Corp. v. Plaza Mortgage Corp., supra at 315. Consequently, because none of the factors which govern a Section 1404(a) transfer, including those that involve the "interests of justice," strongly favors the transfer of this proceeding to the District of Arizona, Weigelt's Motion for a Change of Venue is denied.[2]

NOW, THEREFORE, It is --

ORDERED:

---

[2]Weigelt also argues that a grant of injunctive relief would merit a transfer of venue, because the District of Arizona would be better able to monitor compliance with the injunction. See, Law Bulletin Publications Co. v. LRP Publications, Inc., 992 F. Supp. 1014, 1020-1021 (N.D. Ill. 1998). This argument is has no merit in the context of the present situation, because of our decision that Polar's Motion for a Temporary Injunction should be denied.

1. That Weigelt's Motion for a Change of Venue [Docket No. 13] is DENIED.

2. That Weigelt's Motion to Continue Oral Argument on the Plaintiff's Application for a Temporary Restraining Order/Preliminary Injunction [Docket No. 12] is DENIED.

AND, It is --

RECOMMENDED:

That Polar's Motion for a Temporary Injunction [Docket No. 3] be denied.

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 12, 2000,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 12, 2000**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.